***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. Upon reconsideration the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. At all times relevant hereto, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act and defendant-employer regularly employed three or more employees.
2. All parties have been correctly designated, and there are no questions as to misjoinder or non-joinder of parties.
3. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
4. As of May 17, 2007, an employee-employer relationship existed between plaintiff-employee and defendant-employer.
5. As of May 17, 2007, the carrier on the risk for defendant-employer was Commerce Industry Insurance Company c/o Chartis Claims, Inc., f/k/a AIG Claim Services, Inc.
6. The parties were unable to agree on the plaintiff's average weekly wage, but agreed that it may be determined by an Industrial Commission Form 22 Wage Chart and verified by wage records. Defendants contend that plaintiff's average weekly wage, including overtime and any allowances, was $756.77, producing a compensation rate of $504.54. Plaintiff contends that his average weekly wage, including overtime and any allowances was $808.33, producing a compensation rate of $538.89.
7. Pursuant to an Industrial Commission Form 60, Employer'sAdmission of Employee's Right to Compensation, defendants accepted plaintiff's right to compensation for a right shoulder injury sustained on May 17, 2007.
8. At the hearing before the Deputy Commissioner, the following exhibits were admitted into evidence: *Page 3 
 a. The pre-trial agreement entered into by the parties, marked as Stipulated Exhibit (1).
 b. A packet of medical records, marked as Stipulated Exhibit (2);
 c. A packet of Industrial Commission forms, marked as Stipulated Exhibit (3);
 d. A packet of documents containing Industrial Commission Form 22 and accompanying wage documents, marked as Stipulated Exhibit (4);
 e. A packet of various stipulated exhibits, marked as Stipulated Exhibit (5) and which includes the following:
 i. Email correspondence of Nurse Reba Roseman;
 ii. Light-duty payroll records;
 iii. Reba Roseman's workers' compensation file and;
 iv. TIMCO Occupational Health Clinic medical file.
 f. A packet of documents including plaintiff's Answers to Defendants' First Set of Interrogatories and Request for Production of Documents and Other Related Documents, which were admitted into the record over defendants' objection, and collectively marked as Plaintiff's Exhibit (1) (collectively paginated P213-P260).
 g. A pre-placement physical report, marked as Defendants' Exhibit (1).
 h. A structural mechanic job description, marked as Defendants' Exhibit (2).
 i. A return to work authorization dated May 16, 2007, marked as Defendants' Exhibit (3);
 j. A Supervisor's Injury-Illness Report, marked as Defendants' Exhibit (4); *Page 4 
 k. Correspondence from AIG to plaintiff dated August 13, 2008, marked as Defendants' Exhibit (5);
 l. Email correspondence from Reba Roseman to Sharon Holt dated September 15, 2008, marked as Defendants' Exhibit (6).
9. Also made part of the record are the deposition transcripts of Dr. Adam Kendall, Dr. Andrew Collins, Dr. Cory Adamson and physician's assistant Paul Bailey.
 *********** ISSUES TO BE DETERMINED
1. Whether, with the exception of compensation that may be due pursuant to N.C. Gen. Stat. § 97-31(13), plaintiff is entitled to additional indemnity and medical compensation as a result of his admittedly compensable right shoulder injury;
2. Whether plaintiff sustained a compensable injury to his cervical spine on May 17, 2007 when he fell from a ladder, and, if so, to what indemnity and medical compensation is he entitled;
3. Whether the Industrial Commission should enforce the Industrial Commission Form 26A that the parties executed and submitted to the Industrial Commission on August 27, 2008; and
4. What is plaintiff's correct average weekly wage.
 ***********
Based upon the foregoing stipulations and evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT *Page 5 
1. As of the hearing before the Deputy Commissioner, plaintiff was 51 years of age. Plaintiff is a high school graduate and holds a Federal Aviation Administration license in Airframes and Powerplants. Prior to his employment with defendant-employer, plaintiff served in the United States Navy for 14 years as an aircraft powerplants mechanic before being honorably discharged.
2. Defendant-employer is an aircraft maintenance corporation that performs work for various passenger airlines and freight carriers. Plaintiff has been employed by defendant-employer since 1994 as airframe powerplant mechanic. In this capacity, plaintiff's duties involved inspecting and maintaining airplane engines and structures. The physical requirements of plaintiff's job included lifting in excess of 50 pounds, as well as frequent climbing, bending, stooping, pushing, pulling and the use of heavy equipment.
3. On May 17, 2007, at approximately 1:00 a.m., plaintiff was performing a pressurization vacuum check on a Boeing 767 aircraft when a vent plug malfunctioned. The plug suddenly released or was shot out of its housing, which caused plaintiff to lose his balance and fall to the concrete floor. Plaintiff testified that he landed on his back, neck and right shoulder. At the time of his fall, plaintiff was working on a ladder between 10-15 feet above the floor.
4. Plaintiff testified that after the fall he remained on his back for 20-30 minutes while assessing his injuries. In part because the incident occurred near the end of his shift, plaintiff stated that he went home thereafter and did not immediately seek medical treatment.
5. Immediately after plaintiff's fall, John Ohnimus, a supervisor for defendant-employer who was working nearby on another aircraft, arrived at the scene. Mr. Ohnimus reached plaintiff's location approximately 30 seconds after the fall, at which time plaintiff had *Page 6 
already gotten up and was standing. Plaintiff told Mr. Ohnimus that he was okay and did not need any further attention and that he did not want to file an accident report. Plaintiff returned to work and worked until his shift ended approximately 90 minutes later.
6. Plaintiff's supervisor on the date of injury, David Dominguez, was not present when plaintiff fell. Upon learning of the incident, Mr. Dominguez approached plaintiff to discuss the accident. Plaintiff informed Mr. Dominguez that he was fine and did not require an injury report to be completed or medical treatment.
7. In the days following May 17, 2007, plaintiff worked his normal schedule and did not mention to his supervisors any problems with his shoulders or neck. He did not request or receive medical treatment for his shoulder injury for approximately two months. Plaintiff testified that during this period, his upper back, neck and right shoulder symptoms worsened. Plaintiff continued to work his normal duties until he was medically excused from work for an unrelated foot condition on May 31, 2007.
8. Dr. Richard Escajeda, plaintiff's family physician, treated him for his foot condition. Records from Dr. Escajeda's office dated May 31, 2007 contain no reference that plaintiff reported problems with his neck or upper extremities.
9. In early June 2007, plaintiff was hospitalized for an infection related to his foot condition. The medical records from this period of hospitalization do not reflect that plaintiff reported symptoms related to his cervical spine.
10. Although plaintiff testified that throughout the period he was out of work for his foot condition, his upper extremity symptoms continued, he did not report neck or upper extremity problems to any of the medical providers. *Page 7 
11. Plaintiff returned to work for defendant-employer on July 9, 2007. Upon his return to work, plaintiff began working in an interiors mechanic position. Fakhredin Emamghorashi became plaintiff's supervisor and described this position as being physically demanding. Mr. Emamghorashi further testified that plaintiff did not report any upper extremity or neck problems to him.
12. On July 31, 2007, plaintiff had an appointment with physician's assistant Paul Bailey at the Veterans' Administration Medical Center (hereinafter referred to as the "VA Clinic"). Plaintiff did not report neck pain or upper extremity problems to Mr. Bailey.
13. On August 7, 2007, plaintiff informed Mr. Emamghorashi that an injury report should be completed for his right shoulder. Because Mr. Emamghorashi was not plaintiff's supervisor on May 17, 2007, he spoke with Mr. Dominguez about the incident. Mr. Dominguez testified that until August 7, 2007, he had not heard anything from plaintiff about his fall since the date of its occurrence. Plaintiff testified that he had requested that an accident report be completed on multiple occasions. Plaintiff was referred by the on-site occupational health nurse, Reba Roseman, to Dr. Adam Kendall of Greensboro Orthopedics for treatment of plaintiff's right shoulder.
14. Plaintiff was first examined by Dr. Kendall on August 14, 2007. Following an examination, plaintiff was diagnosed with a shoulder contusion, inflammation of the rotator cuff, and possible cartilage injury to the labrum. Thereafter, plaintiff was referred to physical therapy and assigned light duty work restrictions of lifting no more than 10 pounds with the right arm and no overhead work. Plaintiff returned to work in defendant-employer's light duty program, which was coordinated by Ms. Roseman. Although plaintiff reported to Ms. Roseman on at least 31 occasions, he never complained of any neck problems to her. *Page 8 
15. On September 11, 2007, plaintiff returned to Dr. Kendall, reported minimal right shoulder improvement, and was referred to Dr. Andrew Collins, a shoulder specialist. Plaintiff reported no neck problems to Dr. Kendall.
16. Dr. Collins first examined plaintiff on November 14, 2007, and recommended surgical intervention for his shoulder. Dr. Collins performed an examination of plaintiff's cervical spine, which, as he explained at his deposition, involved touching, palpating, inspecting plaintiff's neck and putting plaintiff through a range of motions to see if certain motions elicited or produced any of the shoulder pain. The cervical spine examination was negative. Dr. Collins continued plaintiff's light duty restrictions and physical therapy. Due to cardiac issues, plaintiff did not undergo the recommended shoulder surgery until March 6, 2008.
17. Following the March 6, 2008, right arthroscopic surgery to repair the labral tear, plaintiff was medically excused from work and was referred to physical therapy and work conditioning. Plaintiff testified that he continued to experience pain in his right shoulder following the surgery, but that his condition did improve as therapy progressed. The physical therapist examined plaintiff's cervical spine and noted full flexion range of motion and bilateral rotation.
18. On April 3, 2008, plaintiff was released to return to light duty work with a 10 pound lifting restriction.
19. On June 6, 2008, Dr. Collins found that plaintiff had reached maximum medical improvement regarding his right shoulder, released him to full duty, and assigned a 15% permanent partial disability rating to plaintiff's right arm.
20. Plaintiff testified that when he was released by Dr. Collins and returned to work, he continued to experience pain and other symptoms in his neck into his right shoulder. *Page 9 
21. Due to his ongoing symptoms, on August 13, 2008, plaintiff asked Ms. Roseman about returning to Dr. Collins, but was informed that he could not because his case was closed. Ms. Roseman denied telling plaintiff that his case was closed.
22. After plaintiff had been performing his regular job without further medical treatment, defendants' claims adjuster, Sharon Holt, attempted to pay plaintiff for his permanent partial disability rating. On August 13, 2008, Ms. Holt sent plaintiff an Industrial Commission Form 26A, Employer's Admission of Employee'sRight to Permanent Partial Disability, which plaintiff signed and returned as instructed. According to plaintiff's wife, plaintiff did not understand what the Form 26A meant, and plaintiff testified that he was still experiencing right shoulder and other upper extremity symptoms at the time he signed it.
23. Also on August 13, 2008, defendants filed an Industrial Commission Form 28T, Notice of Termination of Compensation byReason of Trial Return to Work. Additionally, a second Industrial Commission Form 60 was completed on August 20, 2008 that re-characterized plaintiff's injury as a right shoulder strain. On the amended Form 60, plaintiff's average weekly wage was reduced to $773.64, with a compensation rate of $515.79. A Form 28, Report of Compensation Paid, was also filed on August 20, 2008.
24. After signing the Form 26A, plaintiff hired counsel, who on September 19, 2008, notified Ms. Holt not to submit the form to the Commission because of plaintiff's need for additional treatment. However, the form had already been submitted. On September 26, 2008, plaintiff requested that the Industrial Commission remove the Form 26A from consideration and on December 1, 2008, the Commission ordered that the Form 26A was considered withdrawn.
25. Sixteen months after the date of injury, on September 15, 2008, plaintiff first reported neck problems to Ms. Roseman. Plaintiff claimed that the neck condition was caused *Page 10 
by the compensable injury by accident. Ms. Roseman notified the carrier of plaintiff's complaints of neck pain and request for treatment.
26. On July 27, 2009, plaintiff returned to Dr. Collins, who diagnosed him as having a probable recurrent right shoulder labral tear. An MR arthogram was recommended and plaintiff was expected to return to Dr. Collins for further treatment. Dr. Collins released plaintiff to return to light duty work with restrictions of no lifting more than 20 pounds, no overhead work, and no climbing.
27. On August 3, 2009, defendant-employer offered plaintiff a suitable light duty job, performing the same tasks he performed while working light duty in 2007 and 2008. There is no evidence of record that plaintiff ever responded to this job offer. The Full Commission finds that plaintiff unjustifiably refused this offer of suitable employment.
28. During the period in which defendants did not authorize additional treatment, plaintiff sought care on his own at the VA Clinic. On October 3, 2008, plaintiff complained of neck pain, numbness in his left arm and bilateral wrist pain at an appointment with Mr. Bailey. On November 14, 2008, plaintiff reported pain in his right arm and shoulder and stated that it began in March 2007 when he fell from a ladder. Mr. Bailey reviewed the cervical spine x-rays and diagnosed chronic cervical radiculopathy. On January 3, 2009, plaintiff underwent for the first time a cervical MRI which showed no evidence of trauma and revealed multilevel degenerative disc disease and cervical radiculopathies at the C4-C5, C5-C6 and C6-C7 levels.
29. On March 31, 2009, plaintiff was evaluated at the VA Clinic by Dr. Ben Waldau, chief resident, and Dr. Corey Adamson, neurosurgeon. After reviewing plaintiff's MRI and determining that conservative treatment had failed to relieve his condition, Dr. Waldau *Page 11 
recommended an anterior cervical decompression and fusion procedure at C4 through C7. This procedure was delayed due to plaintiff's unrelated cardiac condition.
30. On May 14, 2009, Dr. Adamson completed a medical status questionnaire in which he provided work restrictions that precluded plaintiff from performing his pre-injury job as an airframe powerplant mechanic or working in the interiors mechanic position. Also on the medical status questionnaire, Dr. Adamson indicated that plaintiff's workplace incident aggravated his pre-existing cervical condition.
31. Plaintiff has not returned to work in any capacity since May 14, 2009. Prior to May 14, 2009, plaintiff continued to work in his regular job and performed physically demanding job duties.
32. On August 24, 2009, plaintiff returned to Dr. Collins for follow-up treatment of his right shoulder. Dr. Collins reviewed the right shoulder MR arthrogram and opined that the testing revealed a labral tear. Dr. Collins recommended an interscalene block, followed by a right shoulder arthroscopic evaluation with labral repair versus debridement. Because of plaintiff's pending anterior cervical discectomy and fusion procedure, Dr. Collins indicated that the arthroscopic shoulder evaluation and procedure would have to be delayed. Dr. Collins assigned plaintiff work restrictions of no lifting more than 10 pounds with the right arm and no overhead work.
33. As of the date of the closing of the record before the Deputy Commissioner, plaintiff had not undergone the arthroscopic procedure and had not yet reached maximum medical improvement with respect to his right shoulder.
34. On September 2, 2009, plaintiff underwent an anterior cervical decompression and fusion at C5-C6 and C6-C7. As of October 26, 2009, plaintiff indicated that he had full *Page 12 
range of motion in the neck, with some tenderness between his shoulder blades. The attending medical resident provided a note removing him from work through February 28, 2010.
35. At his deposition Dr. Adamson testified that his guess was that it was possible that plaintiff's May 17, 2007 fall aggravated plaintiff's pre-existing cervical condition, but that he had no objective data or medical literature to "prove" it. Dr. Adamson further testified that plaintiff suffers from cervical degenerative disc disease which is a natural aging process. Dr. Adamson explicitly stated in his deposition that any opinion would be "hypothetical" and that he considered plaintiff's fall from the ladder to be "irrelevant" in identifying the cause of plaintiff's cervical spine condition. Further, Dr. Adamson was unable to state whether trauma could make a preexisting asymptomatic condition symptomatic. He stated that if there were months between the fall and the onset of neck symptoms, the neck condition was less likely related to the fall.
36. Physician's assistant Bailey completed two medical questionnaires, one on February 27, 2009 and the other on June 4, 2009. On each, Mr. Bailey indicated that plaintiff's workplace incident caused or significantly contributed to the cervical condition for which surgery had been recommended. Mr. Bailey testified at his deposition that he based his opinions on the questionnaires on the history of symptoms plaintiff reported to him. When he was informed that plaintiff did not complain to his medical providers or supervisors of any cervical symptoms for 16 months after the May 17, 2007 incident, Mr. Bailey opined that there was no connection between the fall and plaintiff's neck condition.
38. Dr. Collins was deposed on August 10, 2009, and he stated at his deposition that he was "disappointed" and "to some degree irritate[d]" that plaintiff had not told him about his medical treatment for his cervical spine at the VA. After plaintiff first complained of neck symptoms, Dr. Collins attempted to get approval to treat the neck, not knowing that plaintiff was *Page 13 
already receiving treatment for his neck at the VA. Dr. Collins felt that he was not given a true picture of plaintiff's problems. Dr. Collins never believed during his treatment that plaintiff was having ongoing cervical problems, based on the history plaintiff gave him and his examination of plaintiff. He stated that he found it difficult to understand that he, Dr. Kendall, and his physician's assistant Steve Chabon did not detect some cervical spine problem that was causing some of his shoulder problem. "I would think, if he hurt his cervical spine when he fell, somewhere between the physicians . . . from Dr. Kendall to myself, to Mr. Chabon, that somewhere in there we would have an idea there was a cervical spine problem associated with his shoulder."
39. The Full Commission does not find plaintiff credible concerning his continuing neck problems after the fall and prior to his first report of neck pain on September 15, 2008. This credibility finding is based on plaintiff's inaccurate account of his condition immediately after the fall, his ability to continue to do his regular, physically demanding job duties without complaints, and his failure to report or display any neck symptoms to his treating physicians, coworkers or supervisors for 16 months after the fall. Therefore, based upon the greater weight of the medical and other evidence of record, the Full Commission finds that plaintiff's cervical problems are not causally related to the compensable injury by accident on May 17, 2007.
40. Based upon the totality of the credible vocational and medical evidence of record, and as a result of his admittedly compensable May 17, 2007 injury by accident and causally related right shoulder procedures, plaintiff was unable to earn any wages in his employment with defendant-employer or in any other employment from May 14, 2009 through August 3, 2009, when he unjustifiably refused suitable employment. Any disability after September 2, 2009 was due to plaintiff's non-work related cervical spine condition and surgery. *Page 14 
41. An Industrial Commission Form 22 Wage Chart was stipulated to by the parties. The Form 22 covered the 52 weeks plaintiff worked for defendant-employer prior to his admittedly compensable injury by accident. Plaintiff earned a total of $37,838.41. His attendance records show that he lost more than seven consecutive days in two of the 52 weeks. Because plaintiff did not work a full 52 weeks, the first method outlined in the Act for the calculation of his average weekly cannot be used. Using the second method outlined in N.C. Gen. Stat. § 97-2(5), dividing plaintiff's wages by the number of weeks remaining (50) after deducting the lost time, results in an average weekly wage of $756.77, yielding a compensation rate of $504.54.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On May 17, 2007, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer which resulted in an injury to his right shoulder. N.C. Gen. Stat. § 97-2(6).
2. The first method provided in the Workers' Compensation Act as it relates to actual wages earned is not appropriate in this case. N.C. Gen. Stat. § 97-2(5). The second method within the Act was used for the calculation of plaintiff's average weekly wage, due to the lost time during the 52 weeks preceding his injury by accident.Id. In this case, using the second method of N.C. Gen. Stat. § 97-2(5) results in an average weekly wage that is fair to both parties and approximates what plaintiff would have earned had he not been injured. Bond v. Foster Masonry,Inc., 139 N.C. App. 123, 532 S.E.2d 583 (2000). *Page 15 
3. Pursuant to the second method outlined in N.C. Gen. Stat. § 97-2(5), dividing plaintiff's wages by the number of weeks remaining after deducting the lost time, results in an average weekly wage of $756.77, yielding a compensation rate of $504.54. Id.
4. In workers' compensation cases, a claimant has the burden of proving every element of compensability. N.C. Gen. Stat. §§ 97-2(6); 97-2(9); Harvey v. Raleigh PoliceDepartment,96 N.C. App. 28, 384 S.E.2d 549, disc. rev. denied,325 N.C. 706, 388 S.E.2d 454 (1989); Gaddy v. Kern,17 N.C. App. 680, 195 S.E.2d 141, cert. denied,283 N.C. 585, 197 S.E.2d 873 (1973).
5. North Carolina law requires that where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 265 S.E. 2d 389 (1980). Additionally, "the entirety of causation evidence" must "meet the reasonable degree of medical certainty standard necessary to establish a causal link." Holley v. ACTS, Inc.,357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003); Young v. HickoryBus. Furn., 353 N.C. 227, 538 S.E.2d 912 (2000). "Although medical certainty is not required, an expert's `speculation' is insufficient to establish causation." Holley v. ACTS, Inc.,357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003).
6. Based upon the totality of the lay and medical evidence of record, plaintiff's pre-existing cervical condition is not causally related to the May 17, 2007 admittedly compensable injury by accident. N.C. Gen. Stat. § 97-2(6); Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory Bus.Furn., 353 N.C. 227, 538 S.E.2d 912 (2000); Click v. PilotFreight Carriers, Inc., 300 N.C. 164, 265 S.E. 2d 389 (1980). *Page 16 
7. A claimant can prove his disability in one of four ways by production of: (1) medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work or any employment; (2) evidence that he is capable of some work, but has after reasonable effort has been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but it would be futile because of pre-existing conditions, i.e., age, inexperience, lack of education, to seek other employments; or (4) evidence that he has obtained other employment at a wage less than that earned prior to the injury.Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 425 S.E.2d 454 (1993).
8. Based on the medical evidence, plaintiff was physically unable to earn any wages in his former employment with defendant-employer or in any other employment for the period of May 14, 2009 through August 3, 2009. N.C. Gen. Stat. § 97-29.
9. On August 3, 2009, plaintiff unjustifiably refused a suitable light-duty job, which he had previously performed on multiple occasions and therefore he is not entitled to compensation until such refusal ceases. N.C. Gen. Stat. § 97-32.
10. Any disability sustained by plaintiff after September 2, 2009 is causally related to his non-compensable pre-existing cervical condition and resulting surgery and therefore plaintiff is not entitled to payment of total disability compensation by defendants after September 2, 2009.
11. Based upon the totality of the credible vocational and medical evidence of record, and as a result of his admittedly compensable May 17, 2007 injury by accident and causally related right shoulder surgical procedures, plaintiff was disabled from any employment and is entitled to be paid by defendants total disability compensation at the rate of $504.54 per week from May 14, 2009 through August 3, 2009, when he unjustifiably refused suitable employment. N.C. Gen. Stat. §§ 97-29, 97-32. After September 2, 2009, the date of his cervical surgery, *Page 17 
through February 28, 2010, plaintiff's disability was due to his non-work related cervical condition and therefore plaintiff is not entitled to compensation during that period. N.C. Gen. Stat. §§ 97-29, 97-32; Russell v. Lowe's ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
12. As a result of his admittedly compensable May 17, 2007 injury by accident and causally related right shoulder condition, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred, subject to the provisions of N.C. Gen. Stat. § 97-25.1, when the medical bills have been approved according to established Industrial Commission procedures. N.C. Gen. Stat. §§ 97-25, 97-25.1.
10. The Form 26A signed by both parties but not approved by the Industrial Commission should not be enforced. N.C. Gen. Stat. § 97-17; Baldwin v. Piedmont Woodyards, Inc.,58 N.C. App. 602, 293 S.E.2d 814 (1982).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim for benefits as the result of his cervical spine condition and any disability caused by this condition must be, and hereby is, DENIED.
2. Subject the attorney's fee awarded below, defendants shall pay to plaintiff total disability compensation at the rate of $505.54 per week for the period of May 14, 2009 through August 3, 2009. Having accrued, this compensation shall be paid to plaintiff in a lump sum.
3. To the extent that defendants may have already paid total disability compensation for periods other than awarded above, they are entitled to a credit for any overpayment. *Page 18 
Defendants are also entitled to a setoff for any overpayment of compensation as a result of the prior miscalculation of plaintiff's average weekly wage.
4. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as a result of his admittedly compensable May 17, 2007 injury by accident to his right shoulder, subject to the provisions of N.C. Gen. Stat. § 97-25.1, when the medical bills have been approved according to established Industrial Commission procedures.
5. As plaintiff has not reached maximum medical improvement of his right shoulder, the issue of any permanent functional impairment to his shoulder is RESERVED for future determination.
6. A reasonable attorney's fee of 25% of the compensation awarded in Paragraph 2 above is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff.
7. Defendants shall pay the costs due the Commission.
This 27th day of August, 2010.
 S/___________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
S/___________________ LINDA CHEATHAM COMMISSIONER
S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1